Filed 3/13/15  P. v. Velasquez CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B248580 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA379116) |
| v. | |
| OSCAR VELASQUEZ, | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval and Hillari G. Merritt, Judges.  Affirmed.

Helen S. Irza, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Oscar Velasquez appeals from a judgment and sentence, following his convictions on two counts of attempted murder of a police officer, two counts of assault with a firearm on a police officer, and two counts of being a felon in possession of a firearm. He contends the trial court abused its discretion when it denied his request to appoint his previously retained private counsel to represent him at public expenses, in violation of *Harris v. Superior Court of Alameda County* (1977) 19 Cal.3d 786 (*Harris*). He further complains that he received ineffective assistance of counsel when his trial counsel failed to secure a witness for trial and failed to object to a prejudicial comment made by a prosecution witness. Finally, he contends there was insufficient evidence to support his convictions for being a felon in possession of a firearm, or to support the gang enhancement allegations. Appellant also requests that this court independently review the sealed transcript of the in camera proceeding on his motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). The People have no objection to independent review of the *Pitchess* hearing. For the following reasons, we find no prejudicial error, and affirm.

# PROCEDURAL HISTORY

A Los Angeles County jury convicted appellant of two counts of attempted murder of a peace officer (Pen. Code, §§ 187, subd. (a), 664, subds. (e) & (f); counts 1 & 2),[1] two counts of assault with a firearm upon a peace officer (§ 245, subd. (d)(1) & (2); counts 3 & 4), and two counts of being a felon in possession of a firearm, to wit, a shotgun and .45-caliber pistol, respectively (§ 12021, subd. (a)(1)). The jury found the attempted murders were willful, deliberate and

---

[1] All further statutory citations are to the Penal Code.

2

premeditated.  It also found that appellant committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang, within the meaning of section 186.22, subdivision (b)(1)(C).  Finally, as to count 2, the jury found that a principal personally used a handgun (§§ 12022.53, subds. (b) & (e)(1), 12022.5, subds. (a) & (d)).[2]

Appellant was sentenced to state prison for 74 years and eight months.  He timely filed a notice of appeal.

## FACTUAL BACKGROUND

A.    *Trial Proceedings*

1.    *The Prosecution's Case*

Ramona Gardens is a housing project in Los Angeles County dominated by the Big Hazard criminal street gang.  Due to gang activity in the project being "out of control," Ramona Gardens was covered by a gang injunction and assigned its own police gang unit.  On the evening of January 24, 2009, at around 11:45 p.m., Los Angeles Police Department (LAPD) Officer Jose Vazquez, a member of the Ramona Gardens gang unit, was on foot patrol with his partner, Officer Matthew Ensley.  During the patrol, Vazquez saw two Hispanic men standing near an apartment unit.  Vazquez recognized one of the men as Gilbert Garcia, a member of the Big Hazard gang.  The other man -- later identified as appellant -- was wearing a jacket.  Vazquez knew Garcia had been served with a gang injunction,

---

[2]    The jury found not true the allegations that a principal personally and intentionally discharged and used a shotgun as alleged in count 1, possibly due to conflicting evidence whether the shotgun was operable and testimony suggesting appellant actually fired a handgun, rather than a shotgun (§§ 12022.53, subds. (b), (c) & (e)(1)).

Appellant also was charged with three counts of second degree robbery against three civilians on December 27, 2008, but the jury could not reach a unanimous verdict, and the court declared a mistrial as to those counts.

3

and that Garcia was not supposed to be associating with other gang members or be inside Ramona Gardens. Vazquez walked toward the two men, intending to detain Garcia to investigate a possible injunction violation.

As Vazquez approached, Garcia and appellant ran away, around a nearby building. Vazquez did not see either man with a weapon. Based on their experience, the officers suspected that the two suspects would use a staircase located nearby that led into a park. The two officers headed toward the staircase, going the other way around the building. As the officers approached a building near the staircase, Vazquez went to one corner of the building and took cover while Ensley went to the opposite corner. Vazquez saw the two suspects arrive at the scene. Appellant produced a shotgun and fired one shot at Ensley. Ensley returned fire, shooting twice. Vazquez unholstered his firearm, but did not fire it. Appellant ran away, but Garcia remained and was detained by Ensley. Garcia had no weapon on his person.

While Garcia was taken into custody, Vazquez chased after appellant. Vazquez saw appellant throw the shotgun next to vehicles parked in front of a building. He also saw appellant try to get into an apartment unit -- later identified as appellant's girlfriend's apartment -- knocking on the door and jiggling the door knob. Vazquez approached and ordered appellant to put his hands up. Appellant responded by turning around and pulling a handgun from his waistband. Vasquez testified that it was possible appellant fired at him. Vazquez fired his weapon four times and appellant fell to the ground, dropping the handgun. Three women came out of the apartment, and started yelling at Vazquez not to shoot or kill appellant. Appellant got up and yelled, "Kill me. Finish me off. Shoot me" but Vazquez did not fire again. Appellant then ran away, with Vazquez in pursuit. As appellant ran, he took off his jacket and dropped it. Shortly thereafter, Vazquez lost sight of

4

appellant. Over the police broadcast, he heard that Officer Jaime Anchondo had appellant in custody. Vazquez arrived at the location and saw appellant with Anchondo. Vazquez testified this was the first time he had ever fired his weapon on the job in 14 years of service.

Officer Ensley testified that when appellant and Garcia came around the building near the staircase to the park, he recognized them. Ensley had had prior interactions with both men before, and knew them to be Big Hazard gang members. Upon seeing Ensley, appellant raised a sawed-off shotgun -- which he had held near waist level -- and fired the gun at Ensley. Ensley was not hit. He retrieved his gun and returned fire, but missed appellant. Both appellant and Garcia then turned around and began running. Ensley started screaming, ordering the men to stop. Garcia complied, but appellant continued running. Ensley took Garcia into custody while Vazquez pursued appellant. This incident was the only time Ensley had ever fired his weapon on the job.

Garcia testified as a prosecution witness in exchange for an agreement that he would be relocated. Garcia stated that he was present with appellant when they were approached by Officers Ensley and Vazquez that evening. When the two men saw the officers, they began running toward the staircase. When they subsequently encountered Ensley, Garcia heard two gunshots from Ensley and two shots from another gun. The shots all sounded like they were fired from pistols. Garcia denied possessing any firearms that night, and denied touching the shotgun.

Officer Anchondo responded to a broadcast that a police unit had been shot at and needed help at Ramona Gardens. As Anchondo approached Ramona Gardens, he saw a male running south, followed by a police officer. Anchondo decided to cut off the escape path of the running suspect, later identified as appellant. Anchondo drove southbound, parked his patrol vehicle, and exited.

5

Almost immediately, he came face-to-face with appellant. Anchondo ordered him to "get on the ground." When appellant did not comply, Anchondo struck appellant in the chest with a baton. Appellant went to the ground, and Anchondo handcuffed him. Officer Vazquez arrived on the scene shortly thereafter.

Sergeant Raymond Marquez, the officer in charge of the Ramona Gardens gang unit, was the first supervisor on the scene. Marquez separated Ensley and Vazquez when he arrived, so they could be questioned separately about the incident. Marquez also testified that a crowd formed around the scene. The crowd was unruly and some members threw bottles at the officers.

Officer Pavel Gomez, a member of the Ramona Gardens gang unit, also responded. When he arrived at the scene, he saw appellant being taken to an ambulance. Gomez heard appellant yelling, "Hazard," "I'll kill you all," and "I hope you all die." To Gomez, appellant's statements were meant to threaten the police and to let the community know that the Big Hazard gang was in control of the area.

When Los Angeles Fire Department Emergency Medical Services (EMS) Captain Ken Krupnik responded, he observed his paramedics treating appellant. Appellant was trying to provoke the crowd, which consisted of at least 100 individuals. He was saying things like "kill the pigs" or "shoot the police," and pumping his chest "almost like Tarzan." Krupnik was concerned for his men's safety, because he had been informed recently that there was a "hit" out on the LAPD by the Big Hazard gang.

LAPD criminalist Amy Antaya recovered a pistol (a .45-caliber Rock Island Armory handgun) and a shotgun in the parking lot where Vazquez shot at appellant. The shotgun's wooden stock had been cut, shortening its overall length. Antaya also recovered several discharged cartridge casings for a .45-caliber

6

handgun. She determined that a .45-caliber casing found near where Ensley had shot appellant was fired from the same Rock Island Armory pistol recovered in the parking lot. No expended shotgun shells were found. Antaya testified that she had not always been able to recover expended cartridge casings from shootings.

LAPD criminalist Daniel Rubin, a firearms expert, testified that the shotgun was a "pump action" shotgun. With a pump action shotgun, a shooter would pull on a pump mechanism -- the forend -- to eject any fired shot shell in the firing chamber and push the forend to load a new shot shell into the chamber. Rubin noticed the recovered shotgun had a malfunction: a stud on the "elevator" mechanism that lifts a shot shell up from the magazine to the firing chamber was out of position, which would prevent a shooter from being able to pull the forend completely backward and load a new shot shell into the chamber. Although the elevator was not functioning properly, the shotgun could still be fired, and it was possible to "hand fe[ed]" a shot shell into the shotgun's firing chamber. Rubin opined that tossing the shotgun on the ground might have dislodged the elevator stud.

The shotgun had five live shot shells in the gun's magazine when recovered. There was no shell in the gun's chamber. The shells were loaded with No. 7 steel birdshot shot shells, each the size of the head of a pin. Birdshot dissipates quickly and disappears into the environment. It was over two hours after the shooting before Rubin arrived on the scene and began processing it.

As to the .45-caliber pistol, it was loaded with nine rounds of ammunition, including one in the firing chamber. The pistol's "hammer" was in the "cocked" position and the safety was off. The pistol had an "extended" 10-round magazine which was damaged. Although the pistol was operational, the magazine might cause rounds to jam. One of the rounds found in the discarded pistol was loose in

7

the magazine well. That was consistent with the pistol being fired once and the magazine misfeeding the next round so that it did not end up in the firing chamber. According to Rubin, expended rounds do not always follow a predictable pattern as they are ejected from the pistol.

Criminalist Kevin Hollomon testified as an expert in gun shot residue (GSR) analysis. When someone uses a firearm, GSR is left behind. GSR is typically a combination of antimony, barium, and lead. However, GSR may fall off, be wiped off or be cleaned off. Thus, receiving medical attention may affect the ability to recover GSR. GSR swabs were not collected from appellant until 4:10 a.m., hours after the shooting incident. A GSR swab taken from appellant's hand showed the presence of antimony and lead, but not barium. Holloway was unaware of any activity other than firing a gun that would leave the combination of antimony and lead found on appellant. The presence of GSR on a person's hands, however, did not conclusively establish that the person had fired a gun.

LAPD Officer Matthew Meneses testified as an expert on the Big Hazard gang. In 2009, the gang had roughly 300 self-admitted members. The gang uses the letter H and the biohazard symbol as gang signs. Its primary activities included murder, attempted murder, attempted murder of police officers, robberies, narcotic sales and intimidation of witnesses. Meneses testified as to two predicate crimes, attempted murder and attempted murder of a police officer. Meneses also testified that Ramona Gardens is a difficult place to patrol because it is inaccessible to cars and "very heavily fortified." Rival gangs will not enter it. In addition, there has always been a very high level of tension between the police and the gang in Ramona Gardens. In 2006, there were two attempted ambushes of police officers in the area.

Meneses testified that Garcia was a self-admitted gang member. In his opinion, appellant was a Big Hazard gang member based on his self-admission to Officer Ensley and his gang tattoos. In response to a hypothetical paralleling the facts of this case, it was Meneses's opinion that the crime was committed in association with and for the furtherance and benefit of the gang. It was a violent crime committed by one gang member in association with another gang member on Big Hazard's home turf. It was intended to create an atmosphere of fear and intimidation in the community -- preventing civilians from calling the police -- and to raise the shooter's rank and stature within the gang. By yelling "Hazard," "I'll kill you all," "kill the police," the shooter would be promoting the gang, even though he knew he could be facing a lengthy prison time for shooting at the officers. From his conduct, the community would know that the gang members were willing to pay the price for shooting the police and could infer that those same gang members would be willing to shoot civilians with impunity.

2. *The Defense Case*

No DNA found on the firearms was matched to appellant's DNA profile. Criminalist Susan Bach, however, admitted that a number of studies have shown that between 51 and 70 percent of the time, people do not leave any measurable DNA when touching an object. Fingerprint evidence revealed a print from Garcia on the shotgun, but not appellant.

Marc Scott Taylor, a forensic scientist, testified that the evidence was insufficient to find GSR conclusively, because of the absence of barium, the small amount of material found, and the fact that appellant was shot, which might explain the presence of the antimony and lead.

Bruce Krell, the defense expert on firearms, opined that the shotgun was inoperable and that the pump action loading/unloading mechanism could not be manipulated because of the dislodged elevator stud.

### 3. *Rebuttal*

Rubin testified that he contacted the manufacturer of the shotgun, and spoke with Joseph Bartozzi, senior vice-president and director of technical services. Bartozzi informed Rubin that the problem with the shotgun suffering dislodged elevator studs does occur. Bartozzi himself had personal experience with the phenomenon while conducting "drop tests" -- safety tests that ensure a shotgun would not fire if dropped. Rubin also disagreed with Krell's opinion that the pump action of the shotgun could not be manipulated because of the dislodged elevator stud.

### B. *Proceedings on Motion for a New Trial*

The jury returned its verdicts on February 4, 2013. On April 17, trial counsel filed a motion for a new trial based on newly discovered evidence. The motion made an offer of proof that Guadulupe Perez would testify that she personally observed Vazquez shooting appellant and that appellant was unarmed and had his hands up when he was shot. Perez had been served with a subpoena, but had refused to come to court to give testimony. According to counsel, Perez's failure to comply with the subpoena was based on her fear that she would be arrested by the police for giving testimony. Perez told counsel that a week before the trial, she received a call from someone claiming to be from the police. That person told Perez that she would be arrested for perjury if she appeared to give testimony.

At the hearing on the new trial motion, Perez testified as follows. She lived on the second floor of a building that was across from the building where appellant

was shot, separated by a parking lot filled with cars on the night of the shooting. She estimated the distance between the buildings to be 20 feet.[3]

That night, Perez was looking out of her window when she saw the police chasing appellant. Perez stated she did not know if "they knew who he was, but they were chasing him." Perez knew appellant because he was Ramona (Mona) Garcia's boyfriend, and Perez was friends with Mona's parents. Mona had spoken with Perez about the shooting, and had brought Perez to court to testify.

Perez testified that appellant stopped in front of Mona's apartment. Asked what she saw next, Perez stated: "Well, I saw when they came up to him and then they asked him to put his hands up. And then the police had asked him to put his hands on the door, but he didn't have a gun." When appellant raised his hands, the police officer shot him in the shoulder. Perez did not see anything in appellant's hands. The police officer approached and told appellant to get up. Appellant got up and ran, and the police officer ran after him and shot at him again. On cross-examination, Perez stated that she did not recall hearing shots -- referring to the incident between appellant and Ensley -- just before Vazquez shot appellant.

About two days after the incident, a man in a suit came and spoke with Perez. Perez told him what she had seen, and the man made written notes. Subsequently, an investigator for the defense asked Perez to give testimony. He gave her a document to appear in court. Perez became ill with cancer and could not appear in court. She also did not appear because a man -- on two occasions -- told her that if she did not come to court, he would issue an arrest warrant for her. In addition, Perez was afraid to go to court because a woman told her that she had to come to court or she would be arrested. "And I said no." On cross-examination,

---

[3]     The parties appear to agree that the distance across the parking lot could not have been as little as 20 feet.

11

Perez was asked about the man who gave her the subpoena to come to court. She responded, "I don't remember who he was. I don't -- I don't want to talk about that anymore."

Perez denied ever being told if she came to court she would be arrested for perjury. She denied telling defense counsel that she was afraid of being threatened with arrest for perjury. Perez stated that the cancer treatments made her tired, but "my mind is fine. I forget a little, but it's fine." She stated she would forget dates, but not what she said in a conversation.

Perez said that she came to court because she wanted to help appellant and because she thought what the police did was unfair. In addition, she was no longer afraid because she saw that the man's threat to arrest her was not genuine.

The trial court denied the motion. It found that "Perez observed [a] snapshot in time of an entire length of events" and that the evidence that the police threatened her was "weak and unsubstantiated."

## DISCUSSION

A. *Denial of Motion to Appoint Harris Counsel*

Appellant first contends the trial court abused its discretion in appointing the alternate public defender to represent him instead of the privately retained attorney -- H. Russell Halpern -- who had been representing him in the previous identical action for the past nine months. For the reasons set forth below, we disagree.

1. *Relevant Factual Background*

On March 9, 2010, after the preliminary hearing in the prior underlying action, appellant's family retained Halpern to represent him. According to Halpern, appellant's mother had hired another private attorney for the preliminary hearing, who had charged more than Halpern did. Halpern stated that he had announced ready for trial in September or October 2010, at which time the

12

prosecution turned over the original videotape of a robbery that appellant was charged with committing, necessitating a continuance, as Halpern believed the videotape established that appellant did not commit the robbery. Thereafter, the prosecutor dismissed the case and refiled it on December 15, 2010, at which point the family ran out of funds to pay Halpern.

On December 21, 2010, appellant moved to have Halpern appointed in the new action. At the hearing, Halpern stated that he had made at least 13 court appearances, spoken with numerous witnesses, and "developed relationships with a woman who is supplying us with *Pitchess* witnesses. [¶] . . . We have a community worker who has actively been working with me in obtaining names and addresses of people who have had problems with these two officers in the past, and we have a whole community lined up ready to testify . . . ." Halpern also stated that he was familiar with Ramona Gardens from being there on other matters, had obtained the services of a video expert, had spoken with experts concerning GSR, and had reviewed the "voluminous police reports." According to Halpern, the case was complicated because of the *Pitchess* motions and numerous lay and expert witnesses. Halpern never mentioned Perez or her potentially exculpatory testimony. Nor did Halpern state that he was ready for trial in the new action.

The trial court (Judge Hillari G. Merritt) denied the motion. The court found that while Halpern had done considerable work with experts on GSR, fingerprints, and DNA, "those issues have resolved themselves; the results are in." The court noted that it was a new filing and the matter was now at the arraignment stage. It found that "it would not be particularly time consuming or onerous for either the public defender or alternate public defender . . . to pick up this case." The court stated, "I have heard nothing that indicates that this is such a complicated case that a government attorney could not pick it up here at arraignment and be ready in a

13

timely fashion."  Subsequently, the alternate public defender was appointed to represent appellant.  The alternate public defender entered a not guilty plea on appellant's behalf, and asked that the matter be set for a preliminary hearing.  The alternate public defender also informed the court that Halpern would file a *Harris* writ, but voiced no support for the writ.

On December 30, 2010, a Superior Court panel denied the writ, finding that nothing in the record suggested that appellant would be disadvantaged in his representation by the alternate public defender.  "[T]o the extent that the petitioner's preferred counsel believes it has special knowledge of the case obtained in the course of its previous investigation, nothing would prevent the Alternate Public Defender from obtaining that information from the petitioner's preferred counsel in a request for the petitioner's case file."  On January 27, 2011, this court denied a similar petition for a writ of mandate.

### 2.  *Analysis*

"A criminal defendant's right to counsel is guaranteed by both the federal Constitution's Sixth Amendment (applicable to the states through the Fourteenth Amendment), and by the California Constitution article I, section 15."  (*People v. Sapp* (2003) 31 Cal.4th 240, 256.)  "In Los Angeles County, pursuant to section 987.2, indigent criminal defendants desiring but unable to afford counsel are represented by the public defender.  If the public defender is unable to represent a defendant because of a conflict of interest, the alternate defense counsel is assigned to represent the defendant.  If the alternate defense counsel is unable to represent a defendant because of a conflict of interest, private counsel is assigned." (*Alexander v. Superior Court* (1994) 22 Cal.App.4th 901, 910.)  "The court may depart from this specific order of appointing counsel for an indigent defendant, however, '[i]n the interest of justice.'  (§ 987.2, subd. (d).)  In such a case, the

14

court must make 'a finding of good cause and stat[e] the reasons therefor on the record.' (*Ibid.*)" (*People v. Cole* (2004) 33 Cal.4th 1158, 1184 (*Cole*).) "On appeal, a trial court's orders concerning the appointment of counsel for an indigent defendant are reviewed for abuse of discretion." (*Ibid.*; accord *Harris*, *supra*, 19 Cal.3d at pp. 795-796; see also *Wheat v. United States* (1988) 486 U.S. 153, 159 ["defendant may not insist on representation by an attorney he cannot afford"].)

Relying on *Harris*, appellant contends the trial court abused its discretion in appointing the alternate public defender instead of his prior counsel. *Harris*, however, involved very "specific and unusual facts." (*People v. Lancaster* (2007) 41 Cal.4th 50, 70, fn. 5.) In *Harris*, defendants, members of the so-called Symbionese Liberation Army (SLA), were charged with aggravated kidnapping, robbery, assault with a deadly weapon and false imprisonment. (*Harris*, *supra*, 19 Cal.3d at p. 789.) After the public defender declared a conflict, defendants sought appointment of two private attorneys who had previously represented them in related criminal proceedings concerning their alleged activities as members of the SLA. These attorneys shared certain "political and social perceptions" with defendants, and defendants had come to regard them as "true champions of their cause." (*Id.* at p. 793.) The motion was denied, and the court appointed two alternate private attorneys, who thereafter joined in defendants' request that prior counsel be appointed. The trial court denied the request. (*Id.* at pp. 789-790, 793.) The Supreme Court concluded that the trial court abused its discretion in not appointing prior counsel. Specifically, the trial court failed to consider objective factors, such as the fact that the prior representation "not only established a close working relationship between [defendants] and [the subject attorneys] but also served to provide those attorneys with an extensive background in various factual

15

and legal matters which may well become relevant in the instant proceeding." (*Id.* at p. 798.)

In determining whether the trial court abused its discretion in denying appellant's motion to appoint Halpern, we find the Supreme Court's later holding in *Cole* instructive. There, the defendant's preferred attorney had represented him for 11 months and had personally interviewed numerous witnesses in Massachusetts and New Hampshire. It was further asserted that the attorney had developed a rapport with the witnesses, who would otherwise be reluctant to travel to California to testify. (*Cole*, *supra*, 33 Cal.4th at pp. 1179-1180.) Nevertheless, the Supreme Court found no abuse of discretion in the trial court's denial of the defendant's motion to appoint the preferred attorney. Specifically, the court noted that (1) the alternate public defender "did not actively seek to withdraw as counsel or support [the requested attorney's] appointment," (2) nothing in the record demonstrated "the relationship between defendant and [requested counsel] ever approached the depth of the relationship between the petitioners and their requested counsel in *Harris*," and (3) there was "no showing that defendant disagreed with the [alternate public defender] as to trial tactics or any other aspect of his defense in such a way that he could not cooperate with the [alternate public defender]." (*Id*. at p. 1187.) Similarly, here, the alternate public defender did not seek to withdraw. Nor did the alternate public defender support the appointment of Halpern. Moreover, while appellant preferred Halpern, nothing in the record suggests that the relationship between Halpern and appellant had reached the depth of that between the defendants and their counsel in *Harris*, or that appellant would be unable to work with the alternate public defender.

Appellant contends that Halpern was ready for trial, and the trial court's refusal to appoint him imposed undue delay on appellant's right to a speedy trial

16

and undue costs on the state to pay for work that had already been performed. We disagree. As an initial matter, we note that a change in counsel necessarily results in some delay, but appellant does not suggest that under *Harris*, this fact entitles a defendant who can no longer afford retained counsel the automatic right to have such counsel appointed at public expense.

In addition, as the trial court found, the instant matter was not a particularly complicated case requiring substantial consumption of resources. Much of the case depended on forensic evidence. The court found -- and appellant does not dispute -- that the results of forensic tests were available for any defense counsel to use. Moreover, although Halpern had retained a videotape expert to testify about the videorecording of the charged robbery offenses, he had not retained a GSR or firearm expert for trial. It was trial counsel who retained experts Taylor and Krell to provide lengthy and detailed trial testimony about GSR and the operability of the firearms, resulting in the jury's finding that appellant had not discharged the shotgun at Officer Ensley.

Similarly, the absence of any reference to Perez or her potentially exculpatory testimony by Halpern suggests that Halpern would not have presented a different defense than trial counsel did. Nothing suggests that Perez would have been willing to come to court had Halpern been appointed rather than the alternate public defender. Perez claimed she was afraid to come to court because she was twice informed that she would be arrested if she failed to appear. Halpern's appointment would not have changed that reason. In short, substantial evidence supports the trial court's finding that the instant matter was not a complicated case, and that the alternate public defender would be able to competently and adequately present a defense in a timely matter. Accordingly, the trial court did not abuse its discretion in appointing the alternate public defender. (See *People v. Horton*

17

(1995) 11 Cal.4th 1068, 1100 [no abuse of discretion where it was not demonstrated that preferred attorney "had achieved a familiarity with the issues or evidence that newly appointed counsel would be unable to achieve without considerable duplication of time and effort"].)  Because we conclude there was no abuse of discretion, we do not consider whether defendant was prejudiced by Halpern's absence from the case.  (*People v. Alexander* (2010) 49 Cal.4th 846, 873.)[4]

B.      *Ineffective Assistance of Counsel*

Appellant contends he was denied effective assistance of counsel because (1) trial counsel failed to take reasonable steps to secure the exculpatory testimony of Perez for trial, and (2) trial counsel failed to object to an unduly prejudicial remark made by a prosecution witness.  In order to prevail on a claim of ineffective assistance of counsel, appellant must show (1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a reasonable probability that but for counsel's unprofessional errors, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Gray* (2005) 37 Cal.4th 168, 206-207; *People v. Kelly* (1992) 1 Cal.4th 495, 519-520.)  As the United States Supreme Court has noted:  "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)  Accordingly, when

---

[4]      We note that the delay occasioned by the later substitution of new alternate defense counsel could not have been anticipated by the trial court.

"defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been '"no conceivable tactical purpose"' for counsel's actions." (*People v. Earp* (1999) 20 Cal.4th 826, 896.)

### 1. *Failure to Secure Perez for Trial*

As noted, appellant's trial counsel secured a mistrial on the robbery charges and a jury finding that appellant had not discharged the shotgun. Appellant contends, however, that counsel's failure to secure Perez's presence at trial constituted ineffective assistance. Appellant acknowledges that counsel placed Perez on the defense witness list, arranged for her to be served with multiple subpoenas, and sought a continuance of the trial in order to secure Perez as a "necessary witness." Nevertheless, appellant faults trial counsel for failing to request a body attachment to compel her appearance, failing to request the court's assistance in setting up a conditional examination pursuant to section 1340, or failing to seek a continuance of the trial under section 1050 until Perez completed her chemotherapy.[5] We conclude the record does not show that trial counsel had no conceivable purpose for failing to take additional steps to secure Perez's testimony for trial.

---

[5] Section 1340 provides in relevant part that "[i]f the court determines that the witness to be examined is so sick or infirm as to be unable to participate in the examination in person, the court may allow the examination to be conducted by a contemporaneous, two-way video conference system, in which the parties and the witness can see and hear each other via electronic communication." (§ 1340, subd. (b).)

Section 1050 provides that counsel may request a continuance by filing a written notice together with affidavits or declarations detailing the specific facts showing that a continuance is necessary.

In the motion for a new trial, appellant's counsel explained that, "[a]lthough multiple subpoenas were served on Ms. Perez, her refusal to come to court was not followed by a request that a body attachment be issued by the court and that she be forcibly brought to court. This action was at the time contrary to the strategy of the Defense. Perez was an elderly woman who had relayed suffering from Cancer and effects of Chemo Therapy. A strategic decision was made [that] to continue to request Perez to come to court was best for the case, as opposed to causing her to be apprehended and brought to the court in her condition." The motion also asserted that Perez had refused to come because she had been intimidated by the police not to appear and give testimony.

At the hearing on the motion for a new trial, defense counsel stated that he had sought a continuance before trial and had informed the court of the possibility of a conditional examination, but Perez had continued to refuse to appear in court. Counsel explained that the defense decided not to request a body attachment because "we felt the quality of her testimony would have been degraded" and that she would not agree to give testimony, especially since Perez would know that it was the defense that obtained the body attachment order.

On this record, we conclude that trial counsel acted reasonably in not taking additional steps beyond issuing multiple subpoenas to secure Perez's testimony for trial. In light of Perez's continual and consistent refusal to testify, it was reasonable for defense counsel to attempt to accommodate Perez, rather than alienate her by obtaining a body attachment order. He made a tactical assessment that attempting to secure her presence by force might backfire, making her hostile to the defense and "degrad[ing]" her testimony. Indeed, her refusal on cross-examination to answer further questions about the man who served her with a subpoena showed that Perez could be an uncooperative witness. Additionally, no

20

evidence suggests that Perez's health condition was so compromised that a conditional examination was necessary. In short, we find that appellant has not shown that defense counsel's representation was inadequate.[6]

2. *Failure to Object to Prosecution Witness's Testimony*

Appellant further contends that trial counsel should have objected to EMS Captain Krupnik's comment that he was aware that the gang had put out a "hit" on the police. Defense counsel, however, may not have wished to highlight this solitary remark. In any event, there was no prejudice. The prosecution's gang expert testified in greater details about the same issue. He testified that the gang's main activities included attempted murders of police officers, that there was a very high level of tension between the police and the gang, and that there had been two attempted ambushes of police officers in Ramona Gardens in 2006. Thus, there was no reasonable possibility that objecting to Krupnik's testimony would have resulted in a more favorable outcome.

C. *Sufficiency of the Evidence to Support Gang Allegations*

Appellant next contends that there was insufficient evidence to support the gang enhancement allegations. "In determining whether the evidence is sufficient

---

[6] We note that defense counsel's determination whether to take extraordinary measures to secure a witness's testimony would be based in part on the significance of the testimony. Although Perez was the only purported percipient civilian witness aside from defendant (who did not testify), her testimony was problematic. She was not unbiased, as she was a friend of the family of appellant's girlfriend, who brought her to court. Although defense counsel stated Perez had told him she was threatened with prosecution for perjury should she testify, she denied such threats. Her own explanation for her failure to appear -- that she was afraid she would be arrested if she did not come to court -- strained credulity. She claimed to have seen the incident across a parking lot full of cars near midnight, and then estimated the distance at 20 feet. Finally, she claimed to have heard what Vazquez said to appellant, but could not remember hearing gunshots indisputably fired moments before.

21

to support a conviction or an enhancement, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] This standard applies to a claim of insufficiency of the evidence to support a gang enhancement. [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.) Expert testimony may be used to prove the elements of a gang enhancement allegation. (See, e.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 621; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332-1333.)

"The section 186.22(b)(1) enhancement requires the jury to find that the crime was committed for the benefit of a criminal street gang and with the specific intent to promote the criminal street gang." (*People v. Ramon* (2009) 175 Cal.App.4th 843, 849.) We conclude that substantial evidence supports the jury's findings that the crimes were committed for the benefit of the Big Hazard gang, and that appellant had the specific intent to promote the gang when he shot at the officers and illegally possessed the firearms. The crimes were committed by appellant, an acknowledged Big Hazard gang member, while in the company of another Big Hazard gang member, in territory claimed by the gang. After committing the crimes, appellant claimed the crimes for the gang by yelling out the gang's name (Hazard) and threatening the officers. From appellant's conduct, a

22

reasonable person could infer that members of the Big Hazard gang were not afraid of attacking and killing police officers and accordingly, would not hesitate to kill civilians. In addition, Officer Meneses opined that the shootings increased the community's fear of the Big Hazard gang, and that the gang would benefit from community members' fear and reluctance to report crimes committed by gang members. As our Supreme Court has observed, "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*People v. Albillar* (2010) 51 Cal.4th 47, 63; accord *People v. Gardeley* (1996) 14 Cal.4th 605, 619 [from expert testimony that assault was "'classic'" gang activity that frightened residents and secured gang's drug-dealing stronghold in the area, jury could reasonably conclude charged offense was committed for benefit of gang and with specific intent of promoting its criminal activities under § 186.22, subd. (b)(1)]; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 351, 354 [reasonable jury could infer from expert testimony that violent crimes increased respect for gang and intimidated neighborhood residents, and from other evidence in record that murder was committed with specific intent to promote gang's criminal activities].)

D. *Sentences on Gun Possession Charges*

Appellant contends the sentences imposed for being a felon in possession of a firearm should have been stayed pursuant to section 654, as the evidence was insufficient to establish that appellant possessed the handgun and shotgun at a point in time that was distinctly antecedent to the commission of the other offenses. We disagree. The record shows that when the officers first saw appellant, they did not observe a firearm. However, appellant subsequently

23

produced a weapon on two separate occasions to shoot at the officers. Appellant necessarily possessed those weapons prior to committing his crimes. (See *People v. Jones* (2002) 103 Cal.App.4th 1139, 1147 [defendant "necessarily must have had either actual or constructive possession of the gun while riding in the car, as evidenced by his control over and use of the gun during the shooting"].) In closing, the prosecutor argued that appellant could have had the weapons hidden under his jacket when the officers first saw him, and the record does not foreclose that possibility. In short, substantial evidence supports the jury's findings that appellant illegally possessed the firearms.

Appellant's reliance on *People v. Bradford* (1976) 17 Cal.3d 8, 22 (*Bradford*) and *People v. Venegas* (1970) 10 Cal.App.3d 814 (*Venegas*), is misplaced. In both cases, the defendants fortuitously came into possession of a firearm to commit their assaults. In *Bradford*, the defendant wrestled the peace officer's pistol from him and fired five shots at the officer. (*Bradford*, *supra*, at p. 13.) In *Venegas*, no evidence was presented showing that the defendant was in possession of a firearm before he began shooting. Rather, the evidence suggested that an unidentified third man walked up to defendant's table and pulled out a gun, after which a struggle ensued and the defendant obtained the gun and began shooting. (*Venegas*, *supra*, at p. 820.) In contrast, here, defendant was in possession of the firearms before he used the shotgun to fire at Ensley or produced the handgun to point it at Vazquez.[7]

---

[7] As appellant's convictions could be based on a jury's findings of actual possession of the firearms, we need not address whether the evidence was sufficient to sustain a conviction solely on the basis of constructive possession. However, we note that appellant did actually use the firearms. (Cf. *People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1415 [where a "'gang gun'" was not on appellant's person but located in mattress nearby, evidence was insufficient to

E.    *Pitchess Motion*

Finally, appellant requests that this court review the in camera proceedings on the *Pitchess* motion.  Prior to trial, appellant filed a *Pitchess* motion for discovery of personnel information relating to Officers Vazquez and Ensley relevant to allegations of use of excessive force, dishonesty, and fabrication of evidence.  On November 18, 2011, the trial court found good cause to hold an in camera hearing solely as to acts of violence and fabrication.  After reviewing the materials, the court ordered certain documents disclose to the defense.  We review a trial court's decision on a *Pitchess* motion for an abuse of discretion.

This court has independently reviewed the sealed transcript of the in camera proceeding on the *Pitchess* motion.  We conclude the trial court did not abuse its discretion in determining 11 items from Vazquez's personnel files and 2 items from Ensley's personal files should be disclosed.  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)[8]

---

show constructive possession, because no evidence was presented that appellant had a right to control the firearm].)

[8]    One of the complaints for excessive force was made against both officers. Thus, there were a total of 12 items disclosed to the defense.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

COLLINS, J.

26